CITY OF PASSAIC, PLAINTIFF-APPELLANT, v. CONSOLI-DATED POLICE AND FIREMEN'S PENSION FUND COM-MISSION, AN AGENCY OF THE STATE OF NEW JERSEY, DEFENDANT-RESPONDENT.

Argued March 14, 1955—Decided March 28, 1955.

*Mr. William N. Gurtman* argued the cause for the appellant.

*Mr. Harold Kolovsky*, Assistant Attorney-General, argued the cause for the respondent (*Mr. Grover C. Richman, Jr.*, Attorney-General; *Mr. David M. Satz, Jr.*, Deputy Attorney-General, on the brief).

The opinion of the court was delivered by

VANDERBILT, C. J. The question here presented is whether various sections of *N. J. S. A.* 43:16–5, as amended by the *Laws of* 1952, are constitutional.

The statutory amendments involved, which will hereafter be set forth at length, result from legislative efforts extending over many years to establish a workable pension and retirement system for policemen and firemen. In 1885 the Legislature passed the first public pension law permitting cities to provide pensions for policemen who had 20 years of service or who had attained the age of 60 years, or who had become incapacitated. In 1888 a pension law was enacted for firemen. Between 1887 and 1917 there were 26 different laws passed, all relating to the retirement provisions for policemen and firemen, and by 1918 55 funds had been established covering 3,000 out of a total of 3,700 policemen and 2,150 of the State's 2,300 paid firemen. Generally speaking, the various pension funds had several sources of revenue such as compulsory contributions of members and municipalities based on a certain percentage of the members' salaries, miscellaneous revenues from various municipal sources, and the proceeds from social events sponsored by pension fund members. These sources of revenue proved quite unsatisfactory and most funds soon experienced alarming deficits, largely because no attempt was made to have the revenues paid into the fund relate to the ultimate cost of the pension benefits.

In 1917 the Legislature created a Pension and Retirement Fund Commission to study the whole pension system, and its report made public in 1919 revealed the need for the institution of a sound actuarial system and the building up of adequate reserves:

"Just as in an insurance company every policy holder is a liability, a 'risk' on the company, so in a pension system every employee, even the youngest employee, is a liability, a 'risk' on the system, which can be actuarially determined. In order to be able to fulfill its promises, a sound pension system must plan far ahead, always some sixty or more years into the future. It must determine with the aid of an actuary, as the insurance companies do, the amount of aggre-

gate liabilities to all its present members which would mature at different times in the future. Then it must determine what total assets it will realize in the future from the contributions which its present members will make during their lives and from other revenues. And it is only if the assets ascertained in this way equal the liabilities so determined that a pension system can be considered financially solvent.

If the system provides from the very outset an adequate reserve against its total liabilities, then, with the aid of this reserve, it can carry the tremendous load of the future without breaking down. Unless an adequate reserve is provided, there is no assurance that the system will be able to keep all its promises."

In 1920 the Legislature passed a single uniform retirement law, *chapter* 160 of the *Laws of* 1920, which was incorporated in the *Revision of* 1937 as *R. S.* 43:16–1 *et seq.*, covering all policemen and firemen retirement funds then in existence as well as those to be established later by the voters of any municipality by referendum. This act vested administration of existing funds in a local commission which in the case of municipalities having both policemen and firemen funds consisted of the chief municipal executive, the chief financial officer, a policeman, a fireman, and a lay citizen selected by the other four. Contributions to the fund were made by each member and by each municipality, while the fund also received revenue from miscellaneous state sources including a part of the 2% tax paid by foreign insurance companies. The statute, however, did not carry out the basic recommendations of the Pension and Retirement Fund Commission for it failed to make proper provision for the cost of future pension benefits.

Since 1920 various studies have been made of the pension funds for policemen and firemen and many amendments have been made to the 1920 act, all of which were unsuccessful in placing the funds on a solvent basis. In 1950 at the Governor's request the State Department of Banking and Insurance made an actuarial evaluation of the funds covered by the 1920 Act and found that as of July 1, 1949 some 200 funds had a combined deficit of $209,110,636:

"It will be noted that the deficits are large. The principal reason for this is the inadequacy of contribution rates in the past, although the upward adjustment in salaries in recent years has been a contributing factor."

In 1951 Governor Driscoll directed the State Treasurer to appoint an Advisory Commission on Local Policemen and Firemen's Pension Funds to study and make recommendations with respect to the basic pension fund system established under the 1920 act. The Commission's report dated February 1, 1952 contained these revealing statements:

"The large annual deficiencies now being experienced by the various local funds may be considered as the 'symptom' of the deficits of the funds. Yet, under the present law only this symptom is being met, through the annual municipal deficiency contributions. Nothing is being done at present to solve the major problem on a scientific basis. Thus, as the number of pensioners increases in the future, and the normal contributions required of members and municipalities decreases, the municipal deficiency payments will continue to rise. Analysis of the actuarial report of the Department of Banking and Insurance indicates that these annual deficiency contributions will rise to approximately $10,000,000 by 1964, assuming the continuation of present state moneys. Without present revenues from the State, this annual deficiency peak would approximate $11,500,000. These payments will continue in decreasing amounts up to the end of this century. * * * It is the conclusion of this Commission that a program of providing for the total deficit, rather than merely for annual deficiencies, should be undertaken immediately. This program should be set up in such a way as to safeguard the pension benefits of the members while not placing too heavy a tax burden upon the municipalities. * * * Upon study and consideration, the Commission found that a thirty-year period program of amortizing the deficit would best meet the requirements set out above. This program would require the annual contribution of approximately $9,000,000 in addition to present State revenues, for thirty years in order to meet future obligations under the 1920 Pension Act. It is estimated that ultimate savings of approximately $18,000,000 could be effected through the earning of interest. * * * It was found that the rise from the present level of deficiency contributions to that necessary to amortize the deficit over thirty years would be too great for the municipalities to bear alone. Immediate additional State aid would, therefore, be necessary in order to put this program into operation. * * * The Commission therefore concluded that sound financing required the consolidation of the local funds into one statewide centralized pension system." (at *pages* 16, 17, 19, 21)

The report concluded with recommendations that all local funds should be placed under central control at the state level under the supervision of a Commission that would have actuarial assistance in determining the amount of municipal and state contributions to the fund. Members of the fund,

municipalities, and the State would all contribute, the State's contribution to continue for a period of 30 years, at the end of which time the deficits would have disappeared and the fund would be on a solvent basis.

As a result of these recommendations of the Advisory Commission the Legislature passed *chapter* 358 of the *Laws of* 1952, *N. J. S. A.* 43:16–1 *et seq.*, supplementing and amending the 1920 act and thus applicable to all funds covered under that act. It established in the Department of Treasury a Consolidated Policemen and Firemen's Pension Fund Commission consisting of nine members, two of whom are to be elected by the policemen and two by the firemen, while four are appointees of the Governor with the advice and consent of the Senate, and the remaining member is the State Treasurer who serves in an *ex officio* capacity, *N. J. S. A.* 43:16–6.1. All existing funds under the 1920 act are consolidated and placed under the control of the Commission. Financial maintenance of the consolidated fund is to come from deductions from members' salaries, while each employer-municipality contributes a percentage of the total annual salary paid by it to its employees who are members of the fund. The amendment further provides for a contribution by the employer-municipality as well as by the State in an amount necessary to bring the fund up to a state of actuarial solvency at the end of thirty years:

"(b) All employers, as defined in the supplement to this chapter enacted by laws of one thousand nine hundred and forty-four, chapter two hundred fifty-three, section twelve, as amended and supplemented, shall contribute to the said consolidated fund in the following manner and amounts:

\*       \*       \*       \*       \*       \*       \*       \*

(2) An additional amount annually for a period of thirty years, commencing July first, one thousand nine hundred and fifty-three, equal to sixty-six and two-thirds per centum (66 2/3%) of the share of the particular employer of the annual amortization payment determined by the actuary of the commission to be required to bring the fund to a state of actuarial solvency at the end of said thirty-year period. In determining an employer's share of said annual amortization payment, the actuary shall determine separately, and give due credit to the value of the assets transferred by such employer to said consolidated fund. The amount of each of such annual pay-

ments shall be certified by the commission to the treasurer of each employer prior to the first day of the year in which such payment is required to be made, and said amount shall be appropriated in said employer's budget for that year. Commencing January first, one thousand nine hundred and fifty-four, said annual payment shall be made in two equal portions; the first on the first day of each year, and the second on July first of each year.

(3) A fee, payable on July first of each year commencing with the year one thousand nine hundred and fifty-three, and consisting of such proportion of the administrative expense of the consolidated fund, as determined by the commission, as the number of members under the jurisdiction of such employer then bears to the total number of members in the consolidated fund.

(c) The State of New Jersey shall contribute annually, throughout a period of thirty years, commencing July first, one thousand nine hundred and fifty-three, such amount as may be necessary to make up the balance of each annual payment required by subdivision $(b)(2)$ of this section, so as to bring to actuarial solvency at the expiration of said thirty-year period the consolidated fund hereby created. The amount of such annual contributions by the State shall be certified to the State Treasurer by the actuary of the commission at the time required for other State departmental budgetary certifications. All funds necessary to meet the State's share of said annual payments shall be included in the annual State budget and appropriated by the Legislature."

Thus in effect the Legislature has taken steps to carry out the recommendations of the Advisory Commission in transferring the funds to state control and seeking through enforced contributions to place the consolidated fund on a solvent basis.

The plaintiff municipality had a policemen and firemen's pension fund for some time prior to 1920, to which, of course, the 1920 act became applicable. After the enactment of *chapter* 358 of the *Laws of* 1952 the plaintiff brought this action for a declaratory judgment, claiming that *N. J. S. A.* 43:16–5(*b*)(2) and (*b*)(3) and (*c*) above quoted are unconstitutional. The trial court upheld their constitutionality and we certified the plaintiff's appeal on our own motion while it was pending in the Appellate Division of the Superior Court.

(1) The plaintiff claims that *chapter* 358 of the *Laws of* 1952 is invalid because it constitutes an illegal delegation by the Legislature of taxing authority to the Commission

and the actuary. This is not so, however, because nowhere does the statute empower the Commission to levy taxes. What is delegated is the power to determine the proportionate share each municipality must bear of the amount required to bring the fund up to a state of actuarial solvency within a period of 30 years. The municipality itself, and not the Commission or the actuary, must levy the taxes or otherwise raise this required amount, which in turn is ascertained mathematically by the actuary through application of the prescribed standards. These 1952 amendments represent not a delegation of taxing authority but "the expression of the legislative will and purpose to make changes in the control, administration and sources of retirement and pension funds," *Pension Commission of Police and Fire Department of Atlantic City v. Atlantic City*, 97 *N. J. L.* 117, 121 (*Sup. Ct.* 1922), affirmed 98 *N. J. L.* 794 (*E. & A.* 1923).

██ (2) The plaintiff next attacks the title of the act, claiming it fails to express the object of its provisions as required under *Article IV, Section VII, paragraph* 4 of the *New Jersey Constitution.* The title provides:

"An Act to consolidate and place under control of a State commission all pension funds heretofore created pursuant to Chapter 160 of the Laws of one thousand nine hundred and twenty, as amended and supplemented, for policemen and firemen, creating a State commission for the control and administration of such consolidated fund; providing for the achievement and maintenance of the actuarial solvency of such fund; amending sections 43:16-1, 43:16-2; 43:16-5, and 43:16-7, providing for repeal of section 43:16-6, and supplementing chapter sixteen of Title 43 of the Revised Statutes."

In effect the plaintiff's claim is that the title fails to reveal such facts as the abolition of the local pension commissions, the elimination of local pension funds as such, as well as the imposition upon taxpayers of the burden of remedying past financial inadequacies of the old pension system. It is difficult, however, to see how the title could be more explicit in stating the object of the law. The title is a label, not an index, and it is only necessary that it set forth the object of an act, not its product, *Jersey City v. Martin*, 126 *N. J. L.*

353, 363 (*E. & A.* 1941), *Bucino v. Malone,* 12 *N. J.* 330, 343 (1953).

(3) The next contention is that *chapter* 358 of the *Laws of* 1952 is actually a special law since it can only be applicable to 203 municipalities, and that these are not selected as a class on any basis of population, location or other characteristics which would justify the separate classification. The classification complained of, however, existed under the ·1920 act, the 1952 amendments having no effect upon the classification phase of the original statute. The 1920 act was specifically upheld as against such an attack in *Hulme v. Board of Commissioners of Trenton,* 95 *N. J. L.* 30 (*Sup. Ct.* 1920), affirmed *Hulme v. Donnelly,* 95 *N. J. L.* 545 (*E. & A.* 1921). The act has always been a general one. In 1952 the Legislature merely attempted to place the local funds on an actuarily solvent basis, and in doing so it included all the funds established under the 1920 act and excluded none. Nor is the act special in the constitutional sense because it includes only policemen and firemen's pension funds, and thus excludes pension funds covering other municipal as well as county employees. The exclusions from the statutory class are ordinarily determinative of whether the act is general in the constitutional sense, and a law is special in the constitutional sense when it arbitrarily separates some persons, places or things from others upon which, but for such limitation, it would operate, *Budd v. Hancock,* 66 *N. J. L.* 133, 135 (*Sup. Ct.* 1901), *Raymond v. Township of Teaneck,* 118 *N. J. L.* 109, 112 (*E. & A.* 1937). The Legislature, however, has a wide range of discretion in distinguishing, selecting and classifying, *State v. Garden State Racing Association,* 136 *N. J. L.* 173, 177 (*E. & A.* 1947). Here the classification of firemen and policemen's pension funds was made in the 1920 act, and that act has been upheld against the charge that it was special, *Hulme v. Board of Commissioners of Trenton, supra,* 95 *N. J. L.* 30, 32, affirmed *Hulme v. Donnelly,* 95 *N. J. L.* 545.

(4) There is likewise no merit to the argument that control of policemen and firemen's pension funds is peculiarly

of local concern, and that the Legislature cannot deprive municipalities of the management and control of them. In New Jersey local government has always been a creation of the Legislature and the people have no inherent right of local self-government beyond the control of the State, *Jersey City v. Martin, supra,* 126 *N. J. L.* 353, 361, *Bucino v. Malone, supra,* 12 *N. J.* 330, 345 (1953). Specifically, it has been established that the Legislature has the power to make changes in the control, administration and sources of retirement and pension funds, *Pension Commission of Police and Fire Department of Atlantic City v. Atlantic City, supra,* 97 *N. J. L.* 117, 121, affirmed 98 *N. J. L.* 794.

(5) The plaintiff next anticipates that at some future date the Legislature may repeal the act under review and retain for governmental purposes the fund created thereunder, thus allegedly depriving the individuals and municipality of their rights to contributions made to the fund. Such speculation as to future legislative conduct does not raise an issue for our present consideration.

■ (6) We also reject the argument that the statutory provision requiring the State to contribute to the fund constitutes the creation of a state debt contrary to *Article* VIII, *Section* II, *paragraph* 3 of our Constitution. No debt has been created here, but rather present legislation merely provides that the State shall annually contribute to the fund.

In summary, the statutory provisions in question represent a valid use of legislative power to place policemen and firemen's pension funds upon a solvent, workable basis.

The judgment of the trial court is affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—7.

*For reversal*—None.